CITIZENS ACTION COALITION OF INDIANA, INC., Intervenor–Appellant,

v.

NORTHERN INDIANA PUBLIC SERVICE COMPANY, Industrial Energy Consumers, Bethlehem Steel Corporation, City of Gary, City of Ft. Wayne, Marport Smelting, Inc., U.S. Reduction, Animal By–Products Corp., Eagle Products, Inc., Industrial Intervenors, and Industrial Gas Users, Intervenors–Appellees.

No. 93A02–9101–EX–31.

Court of Appeals of Indiana, Fourth District.

Dec. 9, 1991.

Michael A. Mullett, Columbus, for inter-venor-appellant.

Peter L. Hatton, Frederick F. Eichhorn, Jr., Eichhorn Eichhorn & Link, Hammond, John F. Wickes, Jr., Terence L. Eads, Lewis & Kappes, Fred E. Schlegel, Mary M. Stanley, Ronald D. Gifford, Baker & Daniels, Heidi E. Ling, Robert L. Hartley, Jr., Martin Wade Hartley & Hollingsworth, Indianapolis, for intervenors-appellees.

CHEZEM, Judge.

### Case Summary

Intervenor–Appellant, Citizens Action Coalition of Indiana, Inc. ("CAC"), appeals from an Order issued by the Indiana Utility Regulatory Commission ("Commission"). We affirm.

### Issues

The parties present numerous issues for our review, which we consolidate and re-state as follows:

I.   Does CAC have standing to bring this appeal?

II.   Did CAC waive several issues by failing to raise them on the first appeal?

III.   Did the Commission abuse its discretion when it denied CAC's Motion for Public Hearing and Pre-hearing Conference?

### Facts and Procedural History

This is the second appeal in this case. The first appeal occurred after the Com-

mission entered its final order, and denied the request for reconsideration and rehearing on June 9, 1989. The issues in the first appeal were: (1) whether the Commission unlawfully delegated its authority to determine and fix utility rates under Ind.Code 8–1–2–68 to its Engineering Staff and to NIPSCO; and (2) whether the Commission's ultimate conclusions were supported by sufficient basic findings. *Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Company* (1990), Ind.App., 555 N.E.2d 162, 163. The facts were succinctly set forth there as follows:

NIPSCO is a public utility engaged in the supply of natural gas to customers throughout northern Indiana. On September 15, 1987, it filed a petition with the Commission to increase its base gas rates for retail services by 11.16%. The Commission granted permission to CAC, the Industrial Intervenors Group, and several other parties to intervene.

NIPSCO serves several classes of customers, ranging from residential to industrial. It serves these customers in two different ways. Sales customers purchase gas for their own use from NIPSCO. Transportation customers purchase their gas from other suppliers, and transport it to their location using NIPSCO's lines. NIPSCO has a history of subsidizing some classes of customers, particularly its residential customers, at the expense of others, particularly its industrial transportation customers. These latter customers have, in recent years, threatened to stop using NIPSCO's services because of the subsidization costs they are forced to pay. Accordingly, both in this order and in a previous one, the Commission has directed NIPSCO to gradually reduce its inter-class subsidies. The Commission emphasized the idea of gradualism to avoid rate shock to residential customers, who would see their monthly bills increase drastically if the subsidies were eliminated immediately.

NIPSCO, some of the intervenors, and the Commission engineering staff presented the Commission with cost of service studies which illustrated possible rate increases and their effect on the subsidies. After hearing and reviewing extensive testimony regarding these studies, the Commission adopted the study developed by its engineering staff. The Commission determined the staff study lacked any bias in favor of any customer class, and was therefore preferable to any of the other studies. This study was not an exact blueprint, however, but rather a set of parameters within which NIPSCO had to develop proposed rate schedules which accommodated the competing goals of gradualism and subsidy reduction.

In its final order of October 26, 1988, the Commission granted NIPSCO a rate increase of approximately 10.32%. The Commission further ordered NIPSCO to redesign its rate structure to reduce the inter-class subsidies in accordance with the cost of service study adopted by the Commission. In making its order, the Commission required NIPSCO to attempt two different methodologies, each of which reflected the Commission's goals of gradualism and subsidy reduction. NIPSCO's attempts were subject to approval by the Commission's engineering staff. The Commission also required adjustment of NIPSCO's transportation customers' rates at the end of two years to further the goal of subsidy reduction.

Thus, the Commission granted a rate increase of 10.32% to NIPSCO, and ordered the rate structure redesigned to reflect actual cost-of-service to customers (which would eliminate the subsidies to residential customers). As noted in the Rate Order of 1988:

We find that the re-calculated rates should remain in effect for the two years following the effective date of this order. At the end of such two years the transportation rates should be adjusted to reflect the cost of providing this service. At that time, the rates for the other rate classes should also reflect the cost of providing service or show movement toward such.

On October 19, 1990, NIPSCO submitted its Verified Compliance Filing, which proposed a 3.3% increase in gas rates for the

residential class of customers. In response, the transportation customers objected, arguing that the new rates were not "cost-based" as required by the Rate Order of 1988; they reduced the subsidies by only 54%. On October 30, 1990, CAC filed its Motion for Public Hearing and Pre-hearing Conference, arguing that there should be additional hearings before final approval of the new rates. In addition, CAC argued that the circumstances had changed since the cost-of-service study was completed, and it should be updated to reflect NIPSCO's "current operations."[1]

On December 28, 1990, the Commission issued an Order which denied CAC's request for additional hearings and directed NIPSCO to file new revised rates which would comply with the Rate Order of 1988. As noted in this Order:

> By its own admission, NIPSCO's compliance filing of October 19, 1990, creates transportation rates which still subsidize other classes ... While the Commission's Order of October 26, 1988, contained much comment on the necessity of observing the principles of gradualism and avoiding rate shock to the rate classes other than transportation customers, it also clearly stated that two years following the effective date of the Order, new rates should be filed adjusted to reflect the cost of providing transportation service ... The rates filed on October 19, 1990, as described by NIPSCO, do not accomplish the above result. Therefore, the Commission finds that NIPSCO should file new tariffs which reflect cost-based transportation rates, and which operate to reduce other subsidies and excesses in the remaining rates.

On January 3, 1991, NIPSCO submitted its [Second] Verified Compliance Filing, which eliminated existing subsidies and raised rates for the residential class by 6%. Shortly thereafter, these new rates were approved by the Engineering Staff.

### Discussion and Decision

#### I

■ Intervenors–Appellees, American Maize–Products Company, Inland Steel Company, LTV Steel Company, National Steel Corporation, USX Corporation, Union Carbide Industrial Gases, Inc., and Dalton Foundries, Inc. (collectively, "Industrial Intervenors"), argue that "CAC has no standing to bring this appeal" because "[it] has not shown it is adversely affected by the order being appealed, as required by IC 8–1–3–1."

The two statutes relevant to the issue of standing here are Ind.Code § 8–1–3–1 and § 8–1–3–3. We note that IC § 8–1–3–1 sets forth a method for an appeal of a Commission decision by any person or entity "adversely affected" by a final order of the Commission. *Laborers Local No. 204 v. Public Service Company of Indiana* (1988), Ind., 524 N.E.2d 318. As to IC § 8–1–3–3, it sets forth a method for a person or entity to be named as a party "appellant or appellee" in an appeal of a Commission decision if that person or entity demonstrates a "substantial interest" in the determination of the appeal. *Id.* In addition, IC § 8–1–3–3 provides "[a]ny party applicant, intervenor or protestant in the proceedings had before the commission in the matter from which the appeal is taken shall be and have the rights of a party on appeal ..." Thus, because CAC was an intervenor in this case, it has "the rights of a party" in accordance with IC § 8–1–3–3. In other words, CAC has standing to bring this appeal, and its presence is authorized by IC § 8–1–3–3. *See, Telecommunications Association of Indiana, Inc. v. Indiana Bell Telephone Company* (1991), Ind.App., 580 N.E.2d 713.

We also note that this is the second appeal in this case. CAC participated in the first appeal. In addition, it was CAC's Motion for Public Hearing and Pre-hearing Conference that was denied by the Commission in its Order of December 28, 1990.

#### II

We next address the issue of waiver which has been raised by the Intervenors–

---

1. This study was conducted to determine the cost of providing gas service to customers.

Appellees, Central Soya Company, Inc., Dodge Reliance Electric Industrial Company, Elkhart Brass Manufacturing Company, Inc., Miles, Inc., Phelps Dodge Magnet Wire Company, Slater Steel Corporation, Wabash Alloys, and Zollner Corporation (collectively, "Industrial Gas Users"), Bethlehem Steel Corporation ("Bethlehem"), NIPSCO, and the Industrial Intervenors. In essence, they argue that CAC has waived the issues it now raises because they were available for consideration on the first appeal but were not raised at that time by CAC. We agree.

Even a cursory review of the record discloses that several of the issues CAC raises in this appeal were available for consideration on the first appeal. We restate the issues CAC now raises as follows: (1) whether the Commission was required to hold additional public hearings before approving the gas rates filed pursuant to the Rate Order issued in 1988; (2) whether the second phase of the rate increase was based on test year data which was "stale" as a matter of law; and (3) whether the Commission abused its discretion in denying the additional hearings requested by CAC.

With respect to the first issue regarding additional hearings, it was rejected by the Commission in its Order on Petitions for Reconsideration and Rehearing of June 9, 1989. In its Order, the Commission stated:

[A] third argument raised by the Citizens Action Coalition was that the Commission should conduct further evidentiary hearings before allowing the implementation of the second stage of NIPSCO's rates. Our Order directed NIPSCO to first reduce the subsidy/excess levels for each rate class, utilizing a margin-based approach to transportation rates. We found that two years later, NIPSCO should adjust such margin-based transportation rates to cost-based rates, with the resulting effect of moving all NIPSCO rates to or towards cost-based rates.

The Commission Order clearly and precisely delineates the second step which must be implemented in two years. *We do not believe that any further evidentiary hearings or Orders from this Commission should be necessary or are required in order to implement the second stage of NIPSCO's rates.* Nor is the two-step rate process ordered herein unauthorized or unreasonable. As pointed out by the Industrial Intervenors in their response to CAC's Petition, the Commission has utilized a two-step approach to adjusting rates in numerous cases and such an approach has not been found to be unlawful or unreasonable by the Courts. Further, the Indiana Court of Appeals in *Bethlehem Steel Corporation v. Northern Indiana Public Service Company,* 397 N.E.2d 623, 635 (Ind. App.1979) held that a hearing is not required on whether a utility's filed rates conform to the Order authorizing them. *We may well discover that further hearings regarding this matter are necessary or desireable [sic] and the language of our Order does not preclude such.* We simply find that based on all of the above, our Order need not be revised to require further hearings regarding this matter. (Emphasis supplied.)

Thus, while the Commission indicated that additional hearings may be necessary, it specifically stated that they were *not* required.[2] This rendered the issue ripe for consideration, and CAC should have raised it on the first appeal. CAC's failure to do so resulted in the issue being waived. The law is well-established that an issue is waived if it was available on the first appeal but was not presented. As noted by the Indiana Supreme Court in *Ohio Valley Trust Co. v. Wernke* (1912), 179 Ind. 49, 99 N.E. 734, 736, "[s]o it is that all questions reserved for review by an [a]ppellate [c]ourt must be presented on the first appeal thereafter from a final judgment, or not at all; for thereafter all questions presented by the record will be considered

**2.** Of course, CAC argued *before* the first appeal that additional hearings were required by statute, IC 8-1-2-72.

as finally determined and all such questions not expressly affirmed or reversed will, by implication, be deemed affirmed." In addition, we have stated that our affirmance of a judgment on a prior appeal "established the law of the case as to issues actually raised on appeal *and* issues which by due diligence could have been raised but were not." *Drost v. Professional Building Service Corp.* (1978), 176 Ind.App. 172, 375 N.E.2d 241, 243.

■ Furthermore, even if the first issue was not waived, it is without merit. CAC argues that a hearing was required under the terms of IC § 8–1–2–72, which states:

*Orders; rescission; modification.*

The commission may, at any time, upon notice to the public utility and after opportunity to be heard as provided in sections 54 through 67 of this chapter, rescind, alter, or amend any order fixing any rate or rates, tolls, charges, or schedules, or any other order made by the commission ...

However, the Commission did not "rescind, alter, or amend" its Rate Order of 1988. Instead, the Commission complied with the terms of that Order in approving the "cost-based" rate increase implemented in 1990. We find no error here.

■ With respect to the second issue regarding the test year data being "stale" as a matter of law, it has also been waived by CAC. Before the first appeal, CAC was informed that "cost-based" rates would be implemented in 1990. This was set forth in the Rate Order of 1988, where the Commission stated:

We find that the re-calculated rates should remain in effect for the two years following the effective date of this order.

At the end of such two years the transportation rates should be adjusted to reflect the cost of providing this service. At that time, the rates for the other rate classes should also relect the cost of providing service ...

In addition, CAC was informed before the first appeal that the test year ended in 1987.[3] Thus, CAC could have raised the issue on the first appeal, but did not. The issue has been waived. *Ohio Valley,* 99 N.E. at 736; *Drost,* 375 N.E.2d at 243.

■ Moreover, even if this second issue had not been waived, it is not persuasive. Based on the test year data, the first phase of the rate increase was implemented in 1988. However, because of the concern for rate shock, the Commission did not implement the second phase move toward "cost-based" rates until 1990. We note here that the Commission could have ordered the immediate implementation of "cost-based" rates *in 1988,* but did not. Thus, the gradual phase-in benefited the residential class by delaying "cost-based" rates, and the additional 6% increase, until 1990. Certainly, if the Commission had authority to implement the 6% increase in 1988, it was appropriate to implement it (based on the test year data) in 1990. Whether the test year data is no longer accurate in certain respects is a matter to be addressed in the next rate case before the Commission.

### III

■ With respect to the third issue regarding the Commission abusing its discretion in denying additional hearings, we find it to be wholly without merit. Our standard on review was discussed in *Riggin v. Board of Trustees of Ball State Universi-*

---

3. The purpose of the test year is to provide information useful for the rate-making process. As we have noted previously:

The use of a [sic] historical test period is the generally accepted method for setting rates for the future by taking the actual results for the particular test year and adjusting for any extraordinary and nonrecurring items and for all known and measurable changes. The test year sets the limits by which the factors of rate-making can be known and used for the rate-making process. As a general rule, it does not take into consideration future ex-

penses or future revenues except known changes in both expenses and revenues occurring within a reasonable proximity of the test year. The object of the test year is merely to reflect typical operating conditions of a utility and provide a reliable guide in fixing rates for the future by monitoring actual operating results over a representative period of time. [Citations omitted.]

*Capital Improvement Board v. Public Service Commission* (1978), 176 Ind.App. 240, 375 N.E.2d 616, 630.

*ty* (1986), Ind.App., 489 N.E.2d 616, 625, as follows:

> [A] court of review will not interfere with the acts of an administrative agency which are within the agency's allowable scope of responsible discretion unless it [finds] that the administrative act was arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence. The court may not substitute its own opinions for that of the Board of Trustees, but must give deference to its expertise. A court may not reweigh the evidence or determine the credibility of witnesses. The burden of proving that the administrative action was arbitrary and capricious or an abuse of discretion falls on the party attempting to vacate the administrative order. An arbitrary and capricious act is one that is willful and unreasonable and done without regard to the facts and circumstances of the case; an act without some basis which would lead a reasonable and honest person to the same conclusion.

Here, the Commission was not required to hold additional hearings before approving and implementing the second phase of the rate increase in 1990. Under the facts and circumstances of this case, the Commission did not abuse its discretion in denying CAC's Motion for Public Hearing and Pre-hearing Conference in its Order of December 28, 1990.

Affirmed.

MILLER and BARTEAU, JJ., concur.